BANKRUPTCY COURT FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: ) <br> Integrated Insight Therapy, LLC, ) <br> Debtor. ) | Chapter 11 <br> Case No. 23-14132 (JGR) |

**Declaration of Joel Watts in Support of First-Day Motions**

I, Joel Watts, state the following under penalty of perjury:

1. I am the founder of Integrated Insight Therapy, LLC (the "Company").

2. The Company provides behavioral and mental health, medical, and substance use services to rural residences in Western Colorado, including residential and court ordered treatment programs and crisis services (collectively, the "Services"). The Company has fourteen locations, among which three are for residential treatment. The Company has just under 100 employees.

3. In providing the Services, the Company has relationships with various stakeholders, such as insurance companies, that pay for the Services received by patients of the Company (such stakeholders, the "Payors").

4. Some Payors have agreements with the Company regarding the provision of Services and the payments for such. Under one such arrangement (the "Value-Based Contract"), the Payor pays the Company a fixed amount per month (the "Budgeted Payment"), which is based upon an assumed level of Services (the "Budgeted Services") provided to patients covered by Payor. On a quarterly basis, the Payor reconciles the Budgeted Services against the actual Services provided to patients covered by Payor (the "Actual Services").

5. The reconciliation is designed to generate a payment to the Company if the Actual Services exceed the Budgeted Services, and to generate a setoff against the Company if the Actual Services are below the amount of Budgeted Services (such payments, the "Reconciliation Payments" and such setoffs, the "Reconciliation Setoffs").

6. Another arrangement regarding the Company's provision of Services is for the Company to submit claims to a Payor for each Service provided to each patient ("Fee For Service"). Unlike the monthly payments associated with the Value-Based Contract, payments for Fee For Service work is made weekly and no reconciliation occurs (except as part of routine audit mechanisms).

7. Under either a Value-Based Contract or a Fee For Service arrangement, the Company submits certain codes (the "CPT Codes") to the Payor. The CPT Codes are a standardized set of codes used to describe Services and how such Services are provided. The CPT Codes determine the amount of payment a Payor will make to the Company for its provision of the Services described by such CPT Code.

8. The Company's cash flow arises from two primary sources. One, being payments from Payors on account of the Company's provision of Services, such as the Value-Based Contract and Fee for Service arrangements. The other source being payments under grant programs related to the Company's provision of Services. Roughly 51% is attributable to the former and 49% is attributable to the latter. In both cases, the Company's employees' performance of Services for the patients is the prerequisite for the Company's receipt of revenue.

9. Prior to the Company filing its voluntary petition for relief under chapter 11 (the "Chapter 11 Petition") of title 11 of the United States Code, a Payor's reconciliation associated with a Value-Based Contract caused setoffs that substantially reduced the Company's revenue. Additionally, for roughly the twelve months preceding the petition's filing, the Payor had instructed the Company to suspend its submission of claims for psychiatric services.

10. The delay in payment for the Company's provision of psychiatric Services and the reduction in revenue from the Payor's reconciliation caused cash-flow issues with the Company.

11. The Company does not have a lending relationship with a market-based loan. Instead, the Company has an SBA loan. Additionally, the Company entered into certain merchant account agreements (the "Merchant Account Agreements") with certain counterparties (the "Prepetition Lienholders"). The Merchant Account Agreements, and the SBA loan, substantially encumber all of the Debtor's assets.

12. Unfortunately, the repayment terms under the Merchant Account Agreements were not sustainable in relation to the revenue realities of the Company.

13. The Company entered into an agreement (the "MCA Contract") with MCA Resolve, LLC ("MCA Resolve"), by which the Company made payments to MCA Resolve to be held in escrow and eventually used to negotiate a structured debt settlement with the Prepetition Lienholders.

14. The Company directed payments to MCA Resolve in lieu of making payments to the Prepetition Lienholders on account of the terms of the Merchant

Account Agreements. It does not appear that MCA Resolve provided any services aside from opening the escrow account and accepting payments. The balance from the escrow account was retained by MCA Resolve.

15. One of the Prepetition Lienholders exercised certain remedies under Connecticut law that allow for the pre-judgment attachment of funds to obtain a hold on substantially all of the Company's operational cash. Having no alternative except immediate liquidation, the Company entered into an agreement with such Prepetition Lienholder to allow the Company to have roughly $32,500 returned to the Company and $167,500 paid to such Prepetition Lienholder.

16. As other Prepetition Lienholders exercised more of their remedies from the defaults arising under the Merchant Account Agreements, the Company filed its Chapter 11 Petition without opportunity to fully prepare for an orderly transition into chapter 11.

17. The Company needed to be able to pay its employees for their prepetition work to avoid mass defects to competitors in the field. Without employees, the Company cannot generate revenue and would face immediate liquidation.

18. The Company needs to pay certain vendors that are critical to the Company's operation, such as McKesson and Reliatrax, which respectively provide medical supplies and electronic health records services. Without medical supplies, the Company's ability to provide the Services would be impaired or irreparably harmed. Without electronic health records, the Company would need to revert to a paper-based system. The Company does not presently utilize a paper-based system

for its patient records. Accordingly, the Company would need to utilize the limited assets of the estate to invent a new system. This is the type of irreparable harm the Company seeks to avoid by paying Reliatrax and McKesson.

19. The Company has no source of cash aside from its accounts receivable arising from provision of the Services. However, such assets are encumbered by certain liens of the Prepetition Lienholders.

20. Without access to cash, the Company will be forced to immediately liquidate.

Dated: <u>September 29, 2023</u>.

*Joel L. Watts*
Joel L. Watts (Sep 29, 2023 16:54 MDT)

Joel Watts

# Declaration of Joel Watts in Support of First-Day Motions

Final Audit Report                                                                 2023-09-29

| | |
|---|---|
| Created: | 2023-09-29 |
| By: | Eric Langston (elangston@aegislaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAoDiu8kvrtwRhDZ-0_7nnlenKTDuoQNWW |

## "Declaration of Joel Watts in Support of First-Day Motions" History

- Document created by Eric Langston (elangston@aegislaw.com)
  2023-09-29 - 10:49:43 PM GMT

- Document emailed to joel@integratedinsighttherapy.com for signature
  2023-09-29 - 10:49:57 PM GMT

- Email viewed by joel@integratedinsighttherapy.com
  2023-09-29 - 10:50:18 PM GMT

- Signer joel@integratedinsighttherapy.com entered name at signing as Joel L. Watts
  2023-09-29 - 10:54:06 PM GMT

- Document e-signed by Joel L. Watts (joel@integratedinsighttherapy.com)
  Signature Date: 2023-09-29 - 10:54:08 PM GMT - Time Source: server

- Agreement completed.
  2023-09-29 - 10:54:08 PM GMT

**Adobe Acrobat Sign**